So we'll get started with the first one, which is United States v. Christian Nieves. Good morning, Your Honors. May it please the Court, Edward Zas, Federal Defenders of New York, for Christian Nieves. Before turning to the specific errors in this case, I just wanted to focus first on what I think is the overarching problem here, because it sets the context for everything that went wrong. And that problem is this. of never asking questions that might reveal a potential juror's attitudes. Such a policy prevents voir dire from doing what it must do, assuring that jurors aren't biased and that the parties can exercise their challenges intelligently. Well, this seems like rather an abstract proposition. First of all, we know from one of our precedents that Judge Rakoff doesn't have that kind of policy because, at least in a white-collar case, he asked a number of questions that specifically did go to jurors' potential attitudes. So I'm not sure, you know, there's rhetoric, and then there's what actually happens, and I think I'd prefer to focus on what happens in this case rather than on some generalized abstraction about Judge Rakoff's purported policies. I take your point, Judge Lynch, but it is true that on the record here, Judge Rakoff explicitly says that I never give those questions. You're right, it's not limited to this case. This has been my policy forever. So that's on page A120 of the appendix. So it is what he says. Yeah, but what does that mean? What are questions about jurors' attitudes? Obviously, if you ask questions that could elicit conflicts of interest, that is because those questions would disclose at least potential preconceptions on the part of jurors, right? Yes. So let's talk about this case. So in this case, this is the extreme case of reversible error that the court envisioned in the laws case, where the court held that a district court's discretion in conducting voir dire is not limitless, and a deficient voir dire will give rise to reversal in two situations relevant here. The first is that reversal is necessary where the trial court failed to inquire about or warn against a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by the party. The second situation is where voir dire is so demonstrably brief and lacking in substance as to afford counsel too little information, even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or lifestyles. Both circumstances exist here. First, I want to focus on the failure to probe for gang bias. Can I just ask before you get into that? Yes. Did counsel below specifically, aside, I understand obviously counsel requested questioning, but was there a request for the court to give some kind of instruction or warning to the jury on the question of gangs? I don't think there was such a request made prior to voir dire, during voir dire. I couldn't tell you if there was a request made at some subsequent point, perhaps at the end of the trial. I don't recall such an instruction, so I doubt it. But what the court failed to do here is to inquire about or warn against the very real dangers that jurors would be biased against two young Latino men who by their own admission belonged to the notoriously violent Trinitarios gang at the center of this case. When you say the notoriously violent, I did a little digging into some press, researching what the press had said in the period before this trial about the Trinitarios, about Latin American gangs in general. And I did that, frankly, because I already expected to find stuff. And maybe what you're going to tell me is any reasonable judge should have been aware of that kind of material out in the community, but none of that material was brought to Judge Rakoff's attention. Is that correct? I think that's right. You mean beforehand? Beforehand. Well, even in what counsel said after the jury was already sworn, it seemed to raise objections to just about everything except a question about gang bias in particular. There was a whole roster of things that counsel was unhappy about. But there wasn't a specific focus, I didn't think, and maybe I missed something on the gang issue, let alone some attempt to make a record that there was information available that would suggest that jury members had been exposed to, in effect, prejudicial publicity on that subject. I have two responses, Judge. I think you are mistaken that the one specific thing that counsel Gombiner did bring up was the failure to ask questions about, in his words, Trinitarios and the gangs. So that was raised. And on your other point, I just want to make clear, the concern in this case is not a pretrial publicity problem. That was not the objection, nor is it my objection, the fact that people read a certain article. Well, it's not about certain articles. The question is, you know, how is a judge supposed to assess what kinds of bias might be out there in the community? Now, you know, maybe your answer is this is a sufficiently pervasive problem in the New York area that anyone should know that. And maybe that's the answer. But, you know, I'm not so much thinking about a particular article, although there actually was one that, as far as I can see, was about this defendant and about the slashing incident and the FBI offering a reward and identifying him as a Trinitario and so on. But it's not so much people know about this incident as compared to anything else, that kind of publicity. But, you know, what is a judge to do in assessing whether gangs or – I had a case on the district court where the defense asked for questions about bias against Santa Maria. And I thought, oh, that seems a little far-fetched, but what the heck? And I asked the question, and half the jurors' hands went up. So, you know, there's stuff out there that a judge might not be aware of. Yes, I don't – frankly, Judge Lynch, I don't think that's a real problem here. First, that was not Judge Rakoff's justification. It was not that I don't think gang bias is an issue. But to answer your question more directly, there are several facts that make this case, I guess, sui generis or at least can be decided on very narrow grounds. The first is that you have both sides asking essentially the same question. Have you had some exposure to gang violence? Do you have feelings about gangs? So that's one signal. This is also a case where everyone knows, because there's not like a motion in limine, a series of papers or something. It is apparent from the inception of this case that gang violence is going to be front and center, and it was. And the government had indicated that it was calling an expert on gangs, which they were allowed to call. So in response to your question, how is a judge supposed to know, I'm just thinking of, you know, the examples that come to mind are a mafia case, organized crime cases. I don't think it takes a newspaper article for a judge to say, well, I'm going to wait until opening statements and let the jury have a surprise then. Every case I've seen – I've done this for 30 years. You've seen many more. But it is a regular practice to give a few sentences that are likely to elicit whatever bias may exist in the community. I'm not saying it needs to be a long or controversial statement. But to tell a jury, for example, that this case is about an assault, threats, in a case where it's about the mafia, it's a dereliction of the Sixth Amendment duty. How in the world can the judge or the parties be confident that bias, even unconscious bias, doesn't exist unless the question is asked? Now, in this case, there wasn't even a mention that it was going to be a gang case at all. And so the judge gives – And, of course, the jury was going to find that out in a hurry. It's not like this is a case where the jury – where all that evidence was going to be kept out and the jury would just be assessing as if it were an ordinary speed fight. That's right. It's also not a case where the potentially prejudicial issue may be tangential. There could be a case where some witness down the road may have to be cross-examined about the one time he was in a gang or prosecuting a gang, in which case the parties may have objections. They may say it's going to prejudice one side or the other to have that kind of inquiry at the beginning. But where it's clear that gang violence is going to be central and really inextricably bound up with the charges because the government is using the gang membership and the gang violence as motive to prove the intent of the defendant. So it's not just a peripheral issue likely to affect the trial. It is bound up. This is also not a case where the potential bias is speculative. Is there a pervasive bias in the community against a Latin gang? We know for certain that it's not only in the community. It's in the courtroom because we have the one juror, potential juror, who manages to figure out or suspects that the case, in his words, might involve a gang. He goes up to the judge at sidebar, to his credit, and he candidly says, I can't serve because of my biases. And the judge says, what biases? He says it might involve a gang, prompting his discharge for cross. So this is not the kind of case where the potential for prejudice is speculative. It's right there, and Judge Rakoff is now on notice that it is right there. I'm sorry. I'm well over my time. I haven't gotten to the second error, which was the failure to ask, going back to the general attitudinal question, to ask anything more than basically, what county do you live in and what do you do for a living, and what does your significant other do for a living? That's error two. Thank you so much for your time. Thank you. Good morning, and may it please the court. My name is Jun Xiang, and I represent the United States on this appeal, as I did in the trial below before Judge Rakoff. The defendant asks this court to hold, for the first time ever, that a voir dire conducted by an experienced trial judge in this circuit, which was consistent with how that trial judge has conducted voir dire for decades, exceeded the judge's considerable discretion. Well, let's focus on the gangs for a moment. Would you agree that in the months preceding this trial, there was a considerable volume of press coverage about gang violence, much of it related specifically to MS-13 and the Trinitarios, and much of it stirred up by the Department of Justice? Do you dispute that? I can't say, Your Honor, that I personally know of the amount of press coverage. Okay, well, let me make you aware. This trial was in April of 2021. In October 2020, the New York Times headlined, Six Shot in Brooklyn as New York City's Summer of Violence Spills into Fall, and attributed to police officials the opinion that gang feuds are fueling more than half the shootings in any given year. Two stories in December highlighted gang violence as, quote, a key driver of the violence over the summer and featured a Bronx bodega murder allegedly committed by Trinitarios as typical of the surge in violent crime. That's the New York Times. We'll not talk about the New York Post or Fox News yet. The Justice Department played a role in this. Also in October 2020, the United States Attorney for the Eastern District announced an initiative to deal with gun violence that he attributed to, quote, violent gang members, close quote, who turned parts of the city into, quote, battle zones. In January 2021, three months about before the trial, the same U.S. attorney announced the indictment of 14 MS-13 members on terrorism charges. It was quoted in the Times as saying that MS-13 is responsible for a wave of death and violence that has terrorized communities, leaving neighborhoods on Long Island awash in bloodshed. Just a couple of years before that, the then president of the United States came to the Eastern District of New York, to Long Island, to focus on murders by MS-13 and described gang members as animals. Around the same time as that visit, Fox News described the, quote, savage, close quote, Trinitarios as, quote, just as vicious as MS-13 and had a list of acts of brutality attributed to Trinitarios in New York. In October 2020, the New York Post reported an FBI reward of $5,000 for the arrest of a Trinitario, this Trinitario in this case, for slashing a man in the face. Three weeks before the trial, the Daily News reported that a, quote, teen gang member specifically identified as a Trinitario was arrested for threatening Brooklyn subway riders with a machete. Now, none of that was specifically brought to the judge's attention, but I didn't need it brought to my attention. I went and looked for it because I knew that was out there, and I think most members of the community do know that that's out there. I mean, am I missing something? Or would not a reasonable judge have known that there had been massive publicity about certain Latin American gangs, including the wanted issue in this case, attributing to those gangs, creating a battle zone, streets awash in blood in the city of New York? Do you think that's not something that the judge should have been aware of? So a couple of responses, Your Honor. Just to the very last direct question, I think it's certainly something that one could infer a judge would be aware of just from life. And isn't that why you asked, as well as the defendant asking, that a question about gang bias be asked? Essentially that, because you knew, the government knew, that this was a potential problem, right? The government certainly viewed such a question would be appropriate. We obviously proposed such a question. There was no disagreement between the parties on that. But a couple of reactions just to, I think, Your Honor's overall point. First, I think if we look at the precedents here, if we look at some of the cases where the relevant prejudice was anti-Mexican prejudice in the immigration context, or potential prejudice against financiers on Wall Street at a certain period in time, I would expect that if one looked at the press prior to those periods, there would be similarly salient, on-point, hot-button discussions in the papers, in the news, about those particular biases. I don't think that fact in and of itself controls the legal question on this appeal, which is, I think, as this Court described in Lawles, is there a requirement to probe tailored to and focusing on a specific prejudice, as opposed to a kind of more broader inquiry to assure the trial judge that the jury that's in fact selected is fair and impartial? What broader inquiry was conducted that would have led a judge who was aware of the possibility of anti-gang violence to conclude that these folks are pure of that kind of bias? So I would say this, Your Honor. Let's look at what Judge Rakoff actually said, which is when he described the case, he described the case as one in which both Mr. Nieves and the trial co-defendant conspired to threaten a government witness, and then Mr. Nieves charged with retaliating against that witness. Now, he didn't use the word gangs. He didn't couch it in the framework of Trinitarios. But I would respectfully submit that prospective jurors hearing that, to the extent that they harbor strong feelings about these types of cases, retaliation cases, getting at cooperators, that the delta between what was actually described, and after Judge Rakoff described it in those terms, he asked whether anybody had strong feelings about that, the delta between that description and, oh, and everybody involved here belonged to the Trinitarios, we would submit not that great. And this, to be clear, Your Honors, was not like a RICO conspiracy case in which the government proved up, you know, shooting after shooting, murder after murder. It wasn't that kind of Trinitario case. In fact, Judge Rakoff kept it quite tailored to the specific, obviously, the slashing incident, a number of threatening phone calls that were made afterward, and the nature of the victim's prior testimony, the victim's own involvement in the Trinitarios, et cetera. And so I think for all those reasons, while the government, of course, understands the point that Your Honor made before. Well, there was testimony, was there not, about a specific code of retaliation enforced by the Trinitarios, was there not? That's right, Your Honor. But that was to the point of carrying the government's burden of proving the motive for the attack, right, that it wasn't. No one's suggesting that that was inappropriate. And I guess there was no request for a specific limiting instruction either about that. At least I didn't find one. Not that I can recall, Your Honor. So I'm happy to speak more broadly to the gang bias question or to jump to just the pedigree inquiry, whatever the court would find more helpful. Can I just, I guess I do have one question on the gang bias question. I mean, certainly there's a degree of discretion in terms of questioning about that, but I'm just wondering in the absence of either questioning or any comment from the judge regarding this, even just a simple statement that this involves, you know, allegations of gang violence, what have you, is that, do you not see that as problematic, I guess? I don't think so. And I'm thinking specifically, I'm sorry to interrupt. Well, I'm thinking specifically like a lot of the case law that talks about the discretion in this area and saying that judges don't have to on these sensitive topics necessarily engage in questioning, particularly that's okay not to question. If there's some other statement that at the very least puts out there to the jurors, this involves this particular topic and, you know, if you have an issue, you should not serve or make sure that you don't let bias of this kind impact your decision making. Right. And so I think my answer there, Your Honor, is like I said before, that in the government's view, Judge Rakoff's description of this as a conspiratorial, threatening government witnesses type case, a case involving not only a conspiracy to threaten that government witness, but in the case of Mr. Nieves, actual retaliation against that witness. That gets at the gist of what the case is about. I mean, I think on this appeal, the defense has characterized this as gang case, gang case, gang case, but really this is retaliation against a federal cooperator case, which is something that Judge Rakoff did make clear during the voir dire. I think a helpful analogy, for example, is the Rosales-Lopez decision in the Supreme Court where the argument on appeal was, well, there was a failure to inquire about anti-Mexican bias in particular. But there was a kind of somewhat adjacent question posed about, well, how do you feel about it? I think the term was the alien problem. And the Supreme Court found that to the extent that this area needed to be explored, that that question coupled with the fact that on the facts of that case, to the extent that anybody harbored an anti-bias against Mexicans or Mexican-Americans, that that wouldn't have necessarily inured to one side's favor over the other, that there was no basis to find a Sixth Amendment violation there. I think that's also the case here. This is a case of Trinitario on former Trinitario violence, in which the defense's primary line of attack was to impeach the victim for being a Trinitario, for crimes that he committed while being a Trinitario. I see that my time is up, and so unless the Court has any further questions, we rest on our papers. Thank you. Thank you. Rosales-Lopez supports us, not the government. In that case, the defendants were complaining that the Court had not specifically, I'm sorry, questioned about Mexicans, but the Court did ask the jurors if they had feelings about aliens, which the Court said was adequate. So the subject matter, the potential prejudice, was adequately covered. The government, I think, understandably now tries to run away from all the evidence about the Trinitarios. I would refer you to the expert's testimony, where he not only talked about the history of violence, but the recovery of weapons, including the machetes, Judge Lynch, that you mentioned. On the topics of the many articles you cited, the government says, well, the jury was asked if they had heard about this case or had any feelings about the assault. But, of course, you might not remember a particular article you read about a name, but you might remember that story about the Trinitario or the gangs. That's the problem, is that if you don't even tell the jury the most likely prejudice that's going to exist in the pool, how can you possibly say it's a thorough voir dire that adequately probes for prejudice? I would just distinguish two very important things. How a judge probes for prejudice, where this Court has appropriately given very broad discretion, and whether to probe for prejudice, where a Court has no discretion, where there is, as the Court said in laws, where there's a prejudice that is pervasive or systematic in the community that would have been cured by a question or warning. That's the question or warning the Court has to give. My last point, Your Honors, is just, if you go back and look at the judge's reasons for not divulging the gang point, he says, well, that's an intolerable invasion of privacy. Well, you know, privacy should be respected, but there are ways to deal with privacy concerns that do not trample on the Sixth Amendment. For example, a sidebar, which is exactly what the prospective juror 13 did. There were other reasons the Court gave, but I think none of them justified not telling the pool this crucial fact, as both sides had requested. So we'd ask you to vacate the judgment of conviction and remand for a new trial with a properly selected jury. Thank you so much. Thank you. Thank you both. We'll take the case under advisement.